## MARYLAND CASUALTY CO. v. UNITED STATES.

### No. 5467.

Circuit Court of Appeals, Fourth Circuit.

June 3, 1946.

Before GRONER, Chief Justice, United States Court of Appeals for District of Columbia, and SOPER and DOBIE, Circuit Judges.

Roszel C. Thomsen (John B. Seal and Clark, Thomsen & Smith, all of Baltimore, Md., on the brief), for appellant.

Ellis Lyons, Atty., Department of Justice, of Washington, D. C. (John F. Sonnett, Asst. Atty. Gen., Bernard J. Flynn, U. S. Atty., of Baltimore, Md., and J. Francis Hayden, Sp. Asst. to Atty. Gen., on the brief), for appellee.

GRONER, C. J.

This is an appeal in an action under the Tucker Act,[1] begun by Maryland Casualty Company against the United States in the District Court for the District of Maryland. The United States answered and both parties moved for judgment on the pleadings. The District Court, after hearing, entered judgment for the United States.

A brief statement of the facts follows:

Captain Samuel J. D. Marshall, U. S. A., was in 1917 quartermaster and disbursing officer at Camp Stewart, Virginia, and Mitchel Field, New York. During the period December 1, 1918, to October, 1919, he handled funds of the United States totalling approximately $23,000,000. In 1926, in the settlement of his accounts, a shortage was discovered in the sum of

[1] 28 U.S.C.A. § 41(20).

824

$49,612.18. Appellant, Maryland Casualty Company, as his surety had executed to the United States as obligee an official bond in the penal sum of $10,000, on the condition that Marshall would "carefully discharge the duties to which assigned, and faithfully expend all public money, and honestly account for the same and for all public property which shall or may come into his hands without fraud or delay, * * *." Claim was made against the surety in 1926, and in 1928 an action was begun by the United States in an appropriate District Court against both Marshall and appellant, seeking to recover the indebtedness claimed to be due. In October, 1938, appellant in compromise settlement of its liability paid the sum of $7,-000 to the United States and the action was discontinued as to it. In the latter part of 1943 Private Law No. 165[2] was passed for the relief of Captain Marshall, following which the action was likewise dismissed as to him, and this in turn was followed by the present action begun by appellant, seeking to recover the $7,000 which, as we have seen, it had previously paid in compromise settlement of liability on the bond.

The Act of Congress to which we have referred as Private Law 165 is as follows:

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the General Accounting Office be, and is hereby, authorized and directed to credit the account of Samuel J. D. Marshall, former captain, Quartermaster Corps, United States Army, disbursing officer of the Army at Camp Stewart, Virginia, and Mitchel Field, Long Island, New York, with $49,612.18, this sum being an alleged shortage in the accounts of the said Samuel J. D. Marshall and a balance due the United States while acting as disbursing officer at Camp Stewart, and Mitchel Field, New York, due to the lack of evidence to support certain disbursements."

It will thus be seen that the single question involved is whether the surety on a Government officer's official bond, having compromised and settled its liability, may, upon the passage of a Private Act forgiving the officer's indebtedness, maintain an action for the sum, so paid against the United States under the provisions of the Tucker Act conferring jurisdiction on District Courts of claims "founded upon * * * any law of Congress."

Appellant insists that it may recover on the ground that the Government's original claim against Captain Marshall having been forgiven in full by the terms of the Private Act, the previous payment by appellant as surety creates a credit in Marshall's account in the amount of the overpayment and thus gives rise to a claim against the United States which may be asserted by appellant as subrogee of Marshall's rights.

The United States, to the contrary, contend that, since the Act did not direct repayment of the amount which the surety had paid, nor include any reference to the surety, nor appropriate any sum in repayment, either to Marshall or his surety, nor create any claim for which suit could be brought, it must be considered as designed solely to relieve Marshall of his liability and of any opprobrium by reason of the shortage in his accounts. As such, the United States assert, it is no more than the release to him of the claim of the United States, and in no respect creates a claim *against* the United States. This was the view adopted by the District Court and, we think, correctly, for it is axiomatic that no suit may be maintained against the United States in any court in any case not clearly within the terms of the statute by which the United States consent to be sued. United States v. Michel, 282 U.S. 656, 659, 51 S.Ct. 284, 75 L.Ed. 598. Or, as the rule is expressed a little differently in Schillinger v. United States, 155 U.S. 163, 166, 15 S.Ct. 85, 86, 39 L.Ed. 108, "The United States cannot be sued in their courts without their consent, and in granting such consent Congress has an absolute discretion to specify the cases and contingencies in which the liability of the government is submitted to the courts for judicial determination. Beyond the letter of such consent the courts may not go,

---

[2] 57 Stat. 718.

* * *." And more recently in United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 769, 85 L.Ed. 1058, the Court reiterated the rule in these words: "The United States, as sovereign, is immune from suit save as it consents to be sued (citing cases) and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."

The same general statement of the law has been made time and time again by the Supreme Court and by other courts in a variety of circumstances and conditions, to name all of which would merely lengthen this opinion. We, therefore, content ourselves with reference to only a few. In Price v. United States and Osage Indians,[3] which was brought under an Act of Congress, giving the Court of Claims jurisdiction of claims for property of citizens taken or destroyed by Indians, it was held that consequential damage resulting to property growing out of the depredation of the Indians was not recoverable. And the reason, the Supreme Court said, is that "The right of the plaintiff to recover is a purely statutory right. The jurisdiction of the court of claims cannot be enlarged by implication. It matters not what may seem to this court equitable, or what obligation we may deem ought to be assumed by the government, or the Indian tribe whose members were guilty of this depredation, we cannot go beyond the language of the statute, and impose a liability which the government has not declared its willingness to assume. * * * The government is not liable to suit unless it consents thereto, and its liability in suit cannot be extended beyond the plain language of the statute authorizing it."

And in United States v. Sherwood, supra, the Supreme Court said: "Except as Congress has consented there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States, or for the review of its decisions by appellate courts." And then added: " * * * we think that the Tucker Act did no more than authorize the District Court to sit as a court of claims and that the authority thus given to adjudicate claims against the United States does not extend to any suit which could not be maintained in the Court of Claims."

And see Cummings v. Hardee, 70 App.D.C. 18, 102 F.2d 622, certiorari denied 307 U.S. 637, 59 S.Ct. 1033, 83 L.Ed. 1518; Haskins Bros. & Co. v. Morgenthau, 66 App.D.C. 178, 85 F.2d 677, certiorari denied 299 U.S. 588, 57 S.Ct. 118, 81 L.Ed. 433; and Cloutier v. Morgenthau, 67 App. D.C. 3, 88 F.2d 846, in all of which the subject of government immunity is fully discussed under more or less parallel conditions to those obtaining here. In the light of the cited cases we hold these general principles to be positively established:

(1) That no suit may be brought against the United States without their consent.

(2) That no suit may be maintained against the United States unless clearly within the terms of the statute by which they consent to be sued.

(3) That no officer of the United States is empowered to pay claims against the United States or debts of the United States until an appropriation has been made by Congress for that express purpose.

(4) That no court is authorized to adjudge the United States to owe a debt for which the creditor has no statutory power to obtain payment.

This brings us then to inquire whether the language of the Private Act, quoted in full in the forepart of this opinion, may by any reasonable construction be considered as authorizing appellant to sue for repayment and collect from the United States the money which it paid in settlement of its debt to the United States growing out of its bond. We think a negative answer is compelled. On this question Judge Chesnut, in the court below, accurately remarked,[4] "The tenor of the Act gathered from its title and context seems to be limited to a Bill for the personal relief of Captain Marshall. The language of the Act is consistent only with the view that Congress intended to give up any claim of the United States against Captain Marshall and is not con-

[3] 174 U.S. 373, 375, 376, 19 S.Ct. 765, 766, 43 L.Ed. 1011.

[4] Maryland Casualty Co. v. United States, D.C., 63 F.Supp. 629, 632.

sistent with the view that it was the intention to create a claim *against the United States.*"

Clearly, this view of the District Judge, if subject to criticism at all, must be considered as an understatement of the obvious. There is nothing in the Private Act from which to assume that Congress had any knowledge of the previous part payment by the surety, and certainly nothing to suggest what might have been its reaction to the fact if it had known it, and there is equally nothing to indicate that Congress did not know it. In the extended reports of the Committees of the House and Senate there is nothing to suggest any intent or purpose on the part of Congress, as Judge Chesnut points out, other than to forgive Captain Marshall his debt. The correspondence between Marshall's superior officers and the Committees of Congress, on the consideration of the bill, indicate that there was a general acceptance of the view that responsibility for the deficit was due largely, if not entirely, to the failure of the Army to furnish Captain Marshall adequate and competent personnel, and accordingly a general desire to acquit him of any personal gain or dishonest purpose. But in the view we take of the case itself, it is of no consequence in the present instance whether Congress knew or did not know of appellant's part payment, nor is it of any importance to try to ascertain what might have been the mind of Congress in releasing Captain Marshall's liability for the entire sum of the shortage. In the facts as we have them here, we are, as we have pointed out, confined solely to the determination whether the language used by Congress is susceptible of the construction placed upon it by appellant. Obviously, it is not. So far as the words of the Act are concerned, appellant is a complete stranger to the transaction. There is no authorization to it to bring this action, and this is equally true as to Captain Marshall. There is no authorization to the Treasury to pay a judgment. In short,

there is no language in the Private Act by which the United States consent to be sued by anybody, and equally no authorization to the Treasury to pay a judgment obtained in such an action. If, as the Supreme Court said in United States v. Sherwood,[5] "* * * the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit," it is clear that the Act relied upon here is *totally deficient of anything which, even* impliedly, would warrant this action. Hence it follows that "only by inserting into a (the) statute words that are not there," which the Supreme Court has said may not be done,[6] can any liability be fastened upon the United States. In cases far more favorable to the respective claimant than here, the Supreme Court unhesitatingly applied the restrictive rule. See: Klamath and Moadoc Tribes v. United States, 296 U.S. 244, 56 S.Ct. 212, 80 L.Ed. 202; Knote v. United States, 95 U. S. 149, 24 L.Ed. 442; and United States v. Sherwood, supra.

Perhaps the case nearest in point in the facts is Parker v. United States, 22 Ct. Cl. 100. There the United States had taken a bond from one Travis, Collector of Internal Revenue, to properly account for moneys coming into his hands. Travis defaulted and the United States sued the sureties and recovered from one of them a fractional amount of the total amount of the defalcation. Afterwards Congress passed an Act releasing *all* the sureties from *all* liability. The surety who, at the suit of the United States, had paid his proportion, sought to recover the money on the strength of the fact that the release of "all liability" entitled him to get back the money he had paid. The Court of Claims rejected this contention, saying: "Had Congress wished to repay the very small portion of the judgment already collected, and now in the Treasury, what more easy than to have said so by an explicit direction that the money be refunded, or by the use of other apt language, indicating an intention to com-

---

[5] 312 U.S. 584, 586, 61 S.Ct. 767, 85 L. Ed. 1058.

[6] Pine Hill Coal Co. v. United States,

259 U.S. 191, 196, 42 S.Ct. 482, 483, 66 L.Ed. 894.

pensate the claimant for past hardship as well as to free him from continuing liability."

For the reasons stated above, we are of opinion that the Court below was, in the circumstances of this case, without any jurisdiction to grant the relief prayed. Accordingly, the judgment below should be and is affirmed.

Affirmed.